COPY

# United States District Court

## SOUTHERN DISTRICT OF INDIANA

In the Matter of the Search of
(Name, address or Brief description of person, property or premises to be searched)

a black Motorola Droid Pro model XT610 cellular phone, IMEI # 353635042016481, MSN # L526NW3P59, as further described in Attachment A

**APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT**
(SEALED)

**CASE NUMBER:** 1:13-mj-00213

I Special Agent Melinda B. Belvin, Federal Bureau of Investigation **being duly sworn depose and say:**

**I am a Special Agent and have reason to believe that on the property or premises known as (name, description and/or location)**
a black Motorola Droid Pro model XT610 cellular phone, IMEI # 353635042016481, MSN # L526NW3P59, currently located at the FBI Indianapolis Field Office, 8825 Nelson B. Klein Parkway, Indianapolis, Indiana, Evidence Room #107, Item IB2, Barcode # E4633320

**in the Southern District of Indiana there is now concealed a certain person or property, namely (describe the person or property to be seized)**

See Attachment B

**which is (state one or more bases for search and seizure set forth under Rule 41(c) of the Federal Rules of Criminal Procedure)**

and any other property that constitutes evidence of the commission of a criminal offense, contraband, the fruits of crime or things otherwise criminally possessed or property designed or intended for use or which is or has been used as the means of committing a criminal offense.

**concerning a violation of Title 18 United States code, Sections** 793(d) and (g)

**The facts to support a finding of Probable Cause are as follows:**

See attached Affidavit

**Continued on the attached sheet and made a part hereof.**

Special Agent Melinda B. Belvin, Federal Bureau of Investigation
**Signature of Affiant**

**Sworn to before me, and subscribed in my presence**

March 5, 2013 12:42 p.m. at Indianapolis, Indiana

**Date** **City and State**

Tim A. Baker, U.S. Magistrate Judge

**Name and Title of Judicial Officer** **Signature of Judicial Officer**

**AFFIDAVIT IN SUPPORT SEARCH WARRANT**

I, Melinda B. Belvin, being first duly sworn, hereby depose and state as follows:

1. I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since October 2009. I am currently assigned to the Counterintelligence Division of the FBI's Washington Field Office, where I investigate offenses involving espionage, illegal agents of foreign powers, and unauthorized retention and disclosure of classified information. Before joining the FBI, I was a Special Agent at the Office of Personnel Management ("OPM"), Federal Investigative Service Division, in Washington, DC from March 2008 through October 2009. At OPM, I investigated the suitability of individuals requiring and maintaining access to classified and/or sensitive information and breaches of trust. Before joining OPM, I was an Adult Probation and Parole Officer in the Commonwealth of Virginia for 3 years, and I also served as a Probation Officer in Mobile, Alabama for 1 year. Finally, I was employed as a police officer with the Montgomery Police Department, in Montgomery, Alabama between December 1992 and June 2002. Accordingly, I have considerable experience in complex criminal investigations. Throughout my career, I have interviewed many witnesses, collected many types of evidence, and prepared numerous search warrants for both physical and electronic media.

2. As a federal agent, I am authorized to investigate violations of the laws of the United States and to execute warrants issued under the authority of the United States. The statements in this affidavit are based in part on information developed in the course of this investigation to date and on my experience and background as a Special Agent of the FBI. The information set forth in this affidavit concerning this investigation is known to me as a result of my own involvement in this investigation or has been provided to me by other law enforcement professionals. Because this affidavit is being submitted for the limited purpose of securing a

search warrant, I have not included each and every fact known to me concerning this investigation. In addition, where conversations or statements are related herein, they are related in substance and in part except where otherwise indicated.

**IDENTIFICATION OF PROPERTY TO BE SEARCHED**

3. The property to be searched is a black Motorola Droid Pro model XT610 cellular phone, IMEI # 353635042016481, MSN # L526NW3P59 (referred to hereinafter as the "Phone"). The Phone is currently located at the FBI Indianapolis Field Office, 8825 Nelson B. Klein Parkway, Indianapolis, Indiana, Evidence Room #107, Item IB2, Barcode # E4633320.

**STATUTORY AUTHORITY**

4. For the reasons set forth below, I believe there is probable cause to conclude that the Phone is and contains evidence, fruits, and/or instrumentalities of criminal violations of 18 U.S.C. § 793(d) (Unauthorized Disclosure of National Defense Information) and/or 18 U.S.C. §793(g) (Conspiracy to Disclose National Defense Information).

5. Based on my training and experience, and discussions with the federal prosecutors assigned to this investigation, I have learned that Title 18, United States Code, Section 793(d) makes punishable, by up to ten years imprisonment, the willful communication, delivery, or transmission of documents and information related to the national defense to someone not entitled to receive them by one with lawful access or possession of the same. Specifically, Section 793(d) states:

> (d) Whoever, lawfully having possession of, access to, control over, or being entrusted with any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, instrument, appliance, or note relating to the national defense, or information relating to the national defense which information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation, willfully communicates, delivers, transmits or causes to be communicated, delivered, or transmitted or attempts to communicate, deliver, transmit or cause to be communicated, delivered or transmitted the same to any person not entitled

> to receive it, or willfully retains the same and fails to deliver it on demand to the officer or employee of the United States entitled to receive it . . . shall be fined under this title or imprisoned not more than ten years or both.

18 U.S.C. § 793(d). Further, Section 793(g) makes a conspiracy to violate Section 793(d) also a violation of Section 793 and punishable by up to ten years imprisonment. See 18 U.S.C. § 793(g).

6. Based on my training and experience, and discussion with the federal prosecutors assigned to this investigation, I have learned that "classified" information is defined by Executive Order 13526 (Executive Order), as information in any form that: (1) is owned by, produced by or for, or under control of the United States government; (2) falls within one or more of the categories set forth in the Executive Order; and (3) is classified by an original classification authority who determines that its unauthorized disclosure reasonably could be expected to result in damage to the national security which includes defense against transnational terrorism. Where such unauthorized disclosure reasonably could be expected to cause "exceptionally grave damage" to the national security, the information is classified as "TOP SECRET."

## PROBABLE CAUSE

7. This investigation concerns the unauthorized disclosure of classified information connected with a disrupted suicide bomb attack on a U.S.-bound airliner by the Yemen-based terrorist organization Al-Qaeda in the Arabian Peninsula (AQAP) and the recovery by the United States of a bomb in connection with that plot in April 2012 (referred to hereinafter as "the bomb"). Beginning on May 7, 2012, multiple news organizations published articles about the disrupted suicide bomb attack and recovery of the bomb. The lead article was published by the [redacted] reporters [redacted] and [redacted] on May 7, 2012. It was

entitled, "US: CIA Thwarts New al-Qaida Underwear Bomb Plot." Thereafter, [redacted] and other media outlets published additional articles and/or broadcast television reports about the disrupted suicide bomb attack and recovery of the bomb (referred to collectively hereinafter as the "Media Reports").

8. During its investigation, the FBI has learned from Intelligence Community representatives and/or the FBI's own review of classified documents that the Media Reports contained, in part, information classified up to the TOP SECRET level.

9. Based on my training and experience, I have learned that classified information, of any designation, may be shared only with persons determined by an appropriate United States government official to be eligible for access to such classified information, that is, the individual has received a security clearance, has signed an approved non-disclosure agreement, and possesses a "need to know" the information in question. If a person is not eligible to receive classified information, classified information may not be disclosed to that person.

10. The FBI's investigation has revealed that the first article about the disrupted suicide bomb attack and recovery of the bomb was published by [redacted] t approximately 4:07 p.m. on May 7, 2012. One of the [redacted] reporters who wrote that article was [redacted]. A search of government databases has revealed that [redacted] does not possess, and has never possessed, a security clearance.

11. In connection with the disrupted suicide bomb attack, in late April 2012 the bomb was sent to the FBI Laboratory, in Quantico, Virginia (hereinafter referred to as the "FBI Lab"), for forensic examination by FBI bomb technicians and other forensic examiners and scientists. The FBI's investigation has identified Donald John Sachtleben (SACHTLEBEN) as an FBI consultant who had access to the FBI Lab in April and May 2012 and who logged into a

computer terminal associated with the FBI Lab on May 2, 2012. Review of FBI records has revealed that SACHTLEBEN was born in 1958. SACHTLEBEN became an FBI Special Agent beginning in 1983. In 1990, SACHTLEBEN became an FBI Special Agent Bomb Technician. In that capacity, SACHTLEBEN was certified as an expert in the areas of explosives and hazardous devices. In 1996, SACHTLEBEN became a Supervisory Special Agent and Forensics Examiner in the FBI Explosives Unit located at the FBI Lab. In 2004, SACHTLEBEN became a coordinating forensic examiner for all evidence submitted to the FBI Lab in the aftermath of the 9/11 attacks. In 2007, SACHTLEBEN transferred to the FBI Indianapolis Field Office, where he worked as a bomb technician coordinator for the FBI for Indiana. In September 2008, SACHTLEBEN retired from the FBI.

12. Thereafter, SACHTLEBEN formed Raptor Consulting, LLC, a consulting company providing training and security consulting services to government agencies and private sector businesses. In 2009, SACHTLEBEN, through Raptor Consulting, LLC, entered into a government contract to provide bomb technician consulting services to the FBI. As of April 2012, SACHTLEBEN was also employed as a Visiting Assistant Professor at Oklahoma State University's School of Forensic Sciences. In that capacity, SACHTLEBEN was employed as the Director of Training for Oklahoma State University's Center for Improvised Explosives Research and Training.

13. In April 2012, SACHTLEBEN was a resident of Carmel, Indiana.

14. FBI records reveal that, in April and May 2012, SACHTLEBEN possessed a TOP SECRET security clearance. SACHTLEBEN possessed that clearance since at least October 2008. Based on my training and experience, as a government employee with a security clearance, and prior to the unauthorized disclosure under investigation, SACHTLEBEN would

have executed at least one SF 312 Classified Information Non-Disclosure Agreement (NDA) with the United States government. NDAs are legally binding agreements between an individual being granted, or already in possession of, a security clearance, and the United States government, wherein the parties agree that the individual shall never disclose classified information without the authorization of the United States government. The standard form NDA notifies the individual entering into the agreement with the United States government that the unauthorized disclosure of classified information can lead to criminal prosecution, including for violations of 18 U.S.C. § 793.

15. At this time, the investigation has not revealed any information that SACHTLEBEN was assigned to the examination team responsible for analyzing the bomb upon its arrival at the FBI Lab. FBI email records reveal, however, that at least on April 29, April 30, and May 2, 2012, SACHTLEBEN sent and/or received emails from several individuals at the FBI Lab who were either assigned to the examination team or who were aware of the FBI Lab's forensic analysis of the bomb.

16. The bomb arrived at the FBI Lab for forensic analysis at approximately 9:45 a.m. on April 30, 2012.

17. Examination of telephone toll records for a cellular telephone number associated with [redacted] reporter [redacted] revealed that at approximately 1:32 p.m. on April 30, 2012, less than four hours after the arrival of the bomb at the FBI Lab, a call was made from a cellular

[1] As part of the FBI's investigation, authorization was obtained pursuant to 28 C.F.R. § 50.10(d) to issue subpoenas for the telephone toll records for certain media personnel, including for [redacted] [redacted]. Subscriber records confirmed that [redacted] was the subscriber for the cellular phone number that had contact with SACHTLEBEN's cellular phone number.

telephone number associated with SACHTLEBEN, [redacted],[2] to a cellular telephone number associated with [redacted]. That call lasted approximately two minutes and eighteen seconds.

18. Later that evening, beginning at approximately 7:13 p.m., four text messages were exchanged between SACHTLEBEN's cellular phone and [redacted] cellular phone. These texts were sent at the following approximate times:

| Date | Time | Originating Cellular Phone | Terminating Cellular Phone |
|---|---|---|---|
| 4/30/2012 | 7:13 p.m. | [redacted] | SACHTLEBEN |
| 4/30/2012 | 7:14 p.m. | [redacted] | SACHTLEBEN |
| 4/30/2012 | 7:15 p.m. | SACHTLEBEN | [redacted] |
| 4/30/2012 | 7:15 p.m. | [redacted] | SACHTLEBEN |

19. Beginning at approximately 9:50 a.m. the following day (May 1, 2012), four more text messages were exchanged between SACHTLEBEN's cellular phone and [redacted] cellular phone. These texts were sent at the following approximate times:

| Date | Time | Originating Cellular Phone | Terminating Cellular Phone |
|---|---|---|---|
| 5/1/2012 | 9:50 a.m. | SACHTLEBEN | [redacted] |
| 5/1/2012 | 9:50 a.m. | [redacted] | SACHTLEBEN |
| 5/1/2012 | 10:04 a.m. | SACHTLEBEN | [redacted] |
| 5/1/2012 | 12:49 p.m. | SACHTLEBEN | [redacted] |

[2] FBI email records from April and May 2012 reflect that SACHTLEBEN frequently listed the telephone number [redacted] as his cellular phone number in the signature block of his emails.

20. FBI computer log-on records reveal that beginning at approximately 9:05 a.m. on the morning of May 2, 2012, SACHTLEBEN's unique electronic computer profile logged into the FBI's classified computer system from a computer terminal associated with the FBI Lab. SACHTLEBEN's computer profile logged off FBI Lab's computer terminal at approximately 10:16 a.m. on May 2, 2012.

21. Nine minutes later, at approximately 10:25 a.m., SACHTLEBEN's cellular phone placed a two minute and seven second call to [redacted] cellular phone.

22. Approximately two-and-a-half hours later, [redacted] and another [redacted] reporter called or sent text messages to multiple United States government officials and stated that [redacted] knew the following facts: (1) the United States had intercepted a bomb from Yemen; (2) the FBI was analyzing the bomb; and (3) [redacted] believed, but had not confirmed, that the bomb was linked to AQAP's premier bomb-maker, Ibrahim Al-Asiri. During its investigation, the FBI has learned from Intelligence Community representatives and/or the FBI's own review of classified documents that the facts [redacted] reporters stated they knew as of May 2, 2012 (namely, (1) and (2) in the immediately preceding sentence) constituted classified information as of that date.

23. Additionally, the FBI's investigation has revealed that United States government officials engaged in an effort to stop or delay publication of [redacted] story concerning the recovery of the bomb. [redacted] published its first story concerning the disrupted suicide bomb attack and recovery of the bomb on May 7, 2012.

24. Beginning at approximately 7:32 a.m. on the morning of May 9, 2012, and following the publication of the Media Reports, five more text messages were exchanged between SACHTLEBEN's cellular phone and [redacted] cellular phone. These texts were sent at the following approximate times:

| Date | Time | Originating Cellular Phone | Terminating Cellular Phone |
|---|---|---|---|
| 5/9/2012 | 7:32 a.m. | SACHTLEBEN | [redacted] |
| 5/9/2012 | 7:35 a.m. | [redacted] | SACHTLEBEN |
| 5/9/2012 | 8:10 a.m. | SACHTLEBEN | [redacted] |
| 5/9/2012 | 8:35 a.m. | [redacted] | SACHTLEBEN |
| 5/9/2012 | 9:02 a.m. | SACHTLEBEN | [redacted] |

25. To date, apart from SACHTLEBEN, the FBI's investigation has not identified any other individual who worked at the FBI Lab in April and May 2012 who communicated with [redacted] during that time period.

26. The FBI's investigation has developed no evidence that SACHTLEBEN was authorized, directly or indirectly, by the United States government to deliver, communicate, or transmit any classified information to [redacted], or any other member of the media.

27. The Phone is currently in the lawful possession of the FBI Indianapolis Field Office. It came into the FBI's possession as follows: On May 11, 2012, just two days after SACHTLEBEN's contact with [redacted] on May 9th (described in ¶ 24), and in connection with a heretofore unrelated federal investigation, FBI agents arrested SACHTLEBEN in Carmel, Indiana. SACHTLEBEN was charged in the United States District Court for the Southern District of Indiana with the knowing distribution, and attempted distribution, of child pornography by means of computer, in violation of 18 U.S.C. § 2252(a)(2), and the knowing possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B). See United States v. Donald Sachtleben, No. 1:12-CR-00127-WTL-TAB (S.D. Ind.).

28. I have been informed SACHTLEBEN is presently on release in home detention in connection with the child pornography case.

29. Prior to his arrest on May 11, 2012, the FBI had obtained a search warrant from this Court to conduct a search of SACHTLEBEN's residence, including outbuildings, to look for evidence related to the child pornography charges. See In the Matter of the Search of Residence and Outbuildings Located at [redacted], Carmel, Indiana 46032, as Further Described in Attachment A, No. 1:12-mj-299-KPF (S.D. Ind.).

30. On May 11, 2012, SACHTLEBEN was surveilled by the FBI driving a blue Chevy Suburban, license plate number IN858TZ,[3] from the Indianapolis International Airport to his residence located at [redacted], Carmel, Indiana. SACHTLEBEN was the only individual in the Chevy Suburban at the time. SACHTLEBEN drove the Chevy Suburban into the driveway of his residence and parked it outside of the residence's attached garage in close proximity to the front door of the house. As SACHTLEBEN exited the Chevy Suburban, he was stopped by FBI Special Agents. Thereafter, SACHTLEBEN was informed by FBI agents that they had a search warrant for SACHTLEBEN's residence that would have included any vehicles present. In the abundance of caution, the FBI agents asked SACHTLEBEN if he would consent to a search of the vehicles parked in the driveway of his residence, which included the Chevy Suburban and a red truck. SACHTLEBEN verbally consented to a search of both vehicles, and signed a written consent to search form authorizing the FBI agents' complete search of the vehicles and seizure of "any items which they determined may be related to their investigation." The Chevy Suburban was then searched. The Phone was located in the driver's

[3] A check of Indiana vehicle registration records confirmed that the Chevy Suburban was registered to SACHTLEBEN and his wife at their residence at [redacted], Carmel, Indiana.

side front seat cupholder inside the Chevy Suburban. The Phone was seized by the FBI and later placed into evidence in connection with the child pornography case.

31. Sgt. Jennifer Barnes of the Indiana State Police, who was assisting in the search of SACHTLEBEN's residence, received the Phone and confirmed at the scene that its telephone number was [redacted].

32. The Phone is currently in storage in the FBI Indianapolis Field Office, Evidence Room #107, Item IB2, Barcode # E4633320, located at 8825 Nelson B. Klein Parkway, Indianapolis, Indiana. In my training and experience, I know that the Phone has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Phone first came into the possession of the FBI.

## TECHNICAL TERMS RELATED TO THE SEARCH OF THE PHONE

33. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; and storing dates, appointments, and other information on personal calendars. Wireless telephones can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Some wireless telephones contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving email, and participating in Internet social networks. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: a digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images.

Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or video.

c. Portable media player: A portable media player (or "MP3 Player" or iPod") is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: a GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involves in such navigation. The Global Positioning System, (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. IP address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series

of four numbers, each in the range of 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static – that is long-term – IP addresses, while other computers have dynamic – that is, frequently changed – IP addresses.

g. Internet: the Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

34. Based on my training, experience, and research, I know that the Phone has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on this type of "smart" cellular phone can uncover, among other things, evidence that reveals or suggests who possessed or used the device, emails, texts, email addresses used, IP address information, and internet browsing history.

**<u>ELECTRONIC STORAGE AND FORENSIC ANALYSIS</u>**

35. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time, including text messages. Texts messages sent or received on a cellular phone can be stored on a cellular phone at little or no cost. Even when text messages have been deleted by the user of a cellular phone, those text messages, or remnants of those deleted text files, can be recovered months after they have been deleted from a cellular phone. This is so because when a user of a cellular phone "deletes" a text message, the data contained in that message does not actually disappear; rather, that data remains on the cellular phone until it is overwritten with new data. Deleted text messages, or remnants of deleted text

messages, may reside on the cellular phone for long periods of time before they are overwritten. Such data can sometimes be recovered with forensic tools.

36. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information on the Phone that might serve as evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Phone was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Phone because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. Identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular things is not present on a storage medium.

37. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Phone consistent with the warrant. The examination may require authorities to employ techniques, including but

not limited to computer-assisted scans of the entire medium, that might expose many parts of the Phone to human inspection in order to determine whether it is evidence described by the warrant.

38. *Manner of Execution.* Because this warrant seeks only permission to examine a Phone already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

**CONCLUSION**

39. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Phone described in Attachment A to seek the items described in Attachment B.

**REQUEST FOR SEALING**

40. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the warrant is relevant to an ongoing investigation. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

Melinda B. Belvin
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on March 5, 2013

TIM A. BAKER
UNITED STATES MAGISTRATE JUDGE

# ATTACHMENT A

The property to be searched is described as follows:

> a black Motorola Droid Pro model XT610 cellular phone, IMEI # 353635042016481, MSN # L526NW3P59 (referred to hereinafter as the "Phone"). The Phone is currently located at the FBI Indianapolis Field Office, 8825 Nelson B. Klein Parkway, Indianapolis, Indiana, Evidence Room #107, Item IB2, Barcode # E4633320.

This warrant authorizes the forensic examination of the Phone for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1. All items on the Phone described in Attachment A, including correspondence, records, documents, photographs, videos, electronic mail, chat logs, text messages, and electronic messages, that constitute evidence, fruits, and/or instrumentalities of criminal violations of 18 U.S.C. § 793(d) (Unauthorized Disclosure of National Defense Information), and/or 18 U.S.C. § 793(g) (Conspiracy to Disclose National Defense Information), including:

   a. records or information relating to the disclosure or potential disclosure of United States classified, intelligence, or national defense information;

   b. classified documents, images, records, or information, and any communications relating to any such document, image, record, or information;

   c. records or information relating to the national defense, including but not limited to documents, maps, plans, diagrams, guides, manuals, and other Department of Defense, United States military, and/or weapons material, sources or methods of intelligence gathering, and foreign intelligence;

   d. records or information relating to Donald Sachtleben's ("SACHTLEBEN's") whereabouts, schedule, travel, or activities from April 1, 2012, through May 31, 2012;

   e. all communications to or from SACHTLEBEN from April 1, 2012, through May 31, 2012;

   f. all communications between, and/or among, SACHTLEBEN and any member of the media, including but not limited to, [redacted]

g. all communications between SACHTLEBEN and any Federal Bureau of Investigation (FBI) personnel;

h. records or information relating to the disrupted suicide bomb attack on a U.S.-bound airliner by the Yemen-based terrorist organization Al-Qaeda in the Arabian Peninsula (AQAP) and the recovery by the United States of a bomb in connection with that plot in April 2012;

i. any records or information provided by SACHTLEBEN to any member of the media;

j. the source(s) or potential source(s) of any records or information provided by SACHTLEBEN to any member of the media;

k. records or information relating to the state of mind of SACHTLEBEN;

l. records or information relating to the state of mind of any individuals concerning the communication, disclosure, receipt, or retention of classified, intelligence, or national defense information;

m. records or information relating to knowledge of laws, rules, regulations and/or procedures prohibiting the unauthorized disclosure of classified, intelligence, or national defense information;

n. records or information relating to who used, owned, or controlled the Phone; and

o. records or information relating to the times and/or locations where the Phone was used, including Internet Protocol addresses.

2. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of electronic storage and any photographic form.